IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YEE XIONG,<br><br>      Petitioner,<br><br>  vs.<br><br>M. D. BITER, Warden, California State Prison, Solano,<br><br>      Respondent. | No. 2:11-cv-01314-JKS<br><br>MEMORANDUM DECISION |

   Yee Xiong, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus

under 28 U.S.C. § 2254.  Xiong is currently in the custody of the California Department of

Corrections and Rehabilitation, incarcerated at the California State Prison, Solano.  Respondent

has answered.  Xiong has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

   In May 2008 following a jury trial in the Sacramento County Superior Court Xiong was

convicted of Murder in the First Degree (Cal. Penal Code § 187(a)), with further findings that

Xiong had personally fired a firearm causing death (Cal. Penal Code § 12022.53(d)), that the

crime was committed for the benefit of a street gang (Cal. Penal Code § 186.22(b)(1)), that the

murder occurred as a result of firing a firearm from a vehicle (Cal. Penal Code § 190.2(a)(21)),

and that Xiong had served a prior prison term (Cal. Penal Code § 667.5(b)).  The trial court

sentenced Xiong to life without the possibility of parole on the murder conviction, plus a

consecutive term of twenty-five years to life for the personal use of a firearm enhancement and a

one-year consecutive term for the prior prison term enhancement.  The trial court also imposed

various fines and fees, including, as relevant to the Petition before this Court, a parole revocation

fine.  The California Court of Appeal struck the parole revocation fine and affirmed the

conviction and sentence in all other respects in an unpublished decision,[1] and the California

Supreme Court denied review on March 18, 2010.  Xiong timely filed his Petition for relief in

this Court on March 11, 2011.[2]

The California Court of Appeal summarized the factual basis underlying Xiong's

conviction:

FACTUAL BACKGROUND
On February 17, 2006, Wang Lee brought his chicken to a house party in
north Sacramento to participate in chicken fights.  There were about 20 Hmong men
at the party, including a number of Lee's friends and relatives.  [Xiong] was also at
the party, and had arrived there in a white Cadillac.
[Xiong] and Lee talked for about five minutes.  Lee's brother described the
conversation as "angry" and "harsh" and using "strong words."  He felt [Xiong's]
words were a threat and knew something would happen.
In keeping with the theme of the party, the two men initially discussed
chickens.  Lee had brought his chicken to the party and [Xiong] challenged him,
saying his chicken could kick Lee's chicken's ass, killing it in "one hit."  Lee rose to
the challenge, telling [Xiong] to "bring it on."  [Xiong] said his chicken had recently
fought and needed to rest before fighting again.
The conversation then moved to shootings and the parties' respective gang
involvement.  [Xiong] said he had been shot and "jumped," and that this was not
unusual for him.  He asked Lee and his companions if they were gang members from
the "south area."  Lee said they were from the south area, but they were not in a gang.
[Xiong] also talked about gang members from the north going to the south "doing
shootings" and gang members from the south going to the north "doing shootings."
[Xiong] claimed he was not a gang member, but that he was willing to kill people to
become a "true gangster."  Eventually, the conversation died out.
Because there were no chicken fights to watch at the party, the guests left to
go to an alternate chicken fighting location.

---

[1] *People v. Xiong*, No. C059110, 2010 WL 24156 (Cal. Ct. App. Jan. 6, 2010).

[2] The Petition actually bears a date of "3-11-10."  It appears that this is an inadvertent
scrivener's error.  In any event, the Petition was received and filed by the Clerk of the Court on
May 16, 2011, within the one-year AEDPA statute of limitation.

[Xiong] left the party with at least three of his friends.  They left the party in the white Cadillac which [Xiong] had driven to the party.  [Xiong] was in the driver's seat.

Lee also left with his friends, riding in the front passenger seat of Yang Moua's car.  [Xiong] followed Lee and his friends, running a red light.  He drove slowly by Moua's car, made a U-turn and sped to catch up.  As [Xiong's] car pulled alongside Moua's car, the driver's side window of the Cadillac was open and multiple shots were fired into Moua's car.  Lee died of a gunshot wound to the head.

Three bullets were recovered from Moua's car and one from Lee's head.  Two of the bullets were .45 caliber bullets.  There were two bullet holes in the front right passenger area and the front right passenger window was shattered.

The next day, [Xiong] was pulled over in the Cadillac.  The car was registered to his sister-in-law, but he made the payments on the car, had open access to it and drove it most often.

Upon being interviewed by the police, [Xiong] denied being at the chicken fighting party or in the Cadillac at all on the night of the murder.

A .45 caliber gun was found at [Xiong's] family home.  Ballistics testing confirmed this was not the murder weapon.  However, it appears [Xiong] may have thought it was the murder weapon.  In a conversation between [Xiong] and his brother, Lue Xiong, Xiong told [Xiong] police had found the gun at the house.  [Xiong] then mentioned a ".45" and said it was "Talee's gun."  [Xiong] said he "should have woken up mom and dad to hide it under the pillows."  [Xiong] also told his brother not to tell the police he was in the Cadillac that night, because if he was placed in the Cadillac, he "would not get out."

The jacket [Xiong] had worn to the chicken fighting party was found in the backseat of the Cadillac.  There was gunshot residue on the jacket.  There was also gunshot residue on the shirt [Xiong] was wearing, on the Cadillac's steering wheel, both the interior and exterior of the driver's side door and the ceiling above the driver.  Residue samples were not taken from the backseat area or the passenger side of the car.

The gunshot residue expert testified gunshot residue can be deposited on a shirt without the wearer necessarily firing a gun.  It can be deposited by brushing or leaning against something with residue on it.  He speculated either the front passenger or a backseat passenger could have fired the gun and left residue particles on the driver's side of the car.

Hmong Nation Society (HNS) gang paraphernalia was found in [Xiong's] jail cell in March 2007.  HNS "claims" north Sacramento.  There was a cardboard cutout with the words "Hmong," "Nation," "Society," "Crip," "Northside," and Hmong RBG."  [Xiong] had a tattoo on his back which said "Hmoob Laig" which means, "Hmong gangster or thug."  He had a picture in his cell phone of gang graffiti.  [Xiong's] brother believed he might be a gang member.  Tong Vue, a former HNS member, testified that gang members will ask others where they are from to determine their gang affiliations.  Vue also believed [Xiong] was a gang member and had seen him previously at a gang function.

Detective Joseph Bailey was qualified as an Asian gang expert. He testified the mentality among gang members is consistent among different ethnic groups. The perception of respect is important to gang members and an appearance of lack of respect can result in confrontations, including shootings. Gang members will claim some area of "turf," such as an area where they live or a portion of the city. To go into a rival gang members' turf is considered disrespectful. The primary activities of the HNS gang are criminal, including drug manufacturing and sales, drive-by shootings and murders. Bailey also testified about other shootings by HNS members which were similar to the shooting in this case. Bailey opined the type of shooting done in this case would benefit the HNS gang in that it would promote the reputation and fear of the HNS gang, and could dissuade people from reporting crimes and testifying in court.[3]

## II.  GROUNDS RAISED/DEFENSES

In his Petition Xiong incorporates by reference his Appellant's Opening Brief filed in the California Court of Appeal in which he raised four grounds:  (1) the trial court erroneously granted the prosecution's challenge to a juror; (2) there was insufficient evidence to support the personal discharge of a firearm conviction; (3) the court improperly admitted the testimony of a detective as a gang expert; and (4) the parole revocation fine was improperly imposed.[4] Respondent contends that Xiong's third ground, admission of the detective's gang expert testimony, is procedurally barred.  Respondent raises no other affirmative defense.[5]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[3] *Xiong*, 2010 WL 24156 at *1-2.

[4] Because, as Respondent correctly points out, the California Court of Appeal struck this part of the sentence, the matter is now moot and need not be considered by this Court.

[5] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2012).

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[6]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[7]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[8]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[9]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[10]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[11]  "[A]bsent a specific constitutional

---

[6] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[7] *Williams*, 529 U.S. at 412 (alteration added).

[8] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[9] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[10] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[11] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"[12]  In a

federal habeas proceeding, the standard under which this Court must assess the prejudicial

impact of constitutional error in a state court criminal trial is whether the error had a substantial

and injurious effect or influence in determining the outcome.[13]  Because state court judgments of

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden

of showing by a preponderance of the evidence that he or she merits habeas relief.[14]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  *Cf. Felker v.
> Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing
> AEDPA's "modified res judicata rule" under § 2244). *It preserves authority to issue
> the writ in cases where there is no possibility fairminded jurists could disagree that
> the state court's decision conflicts with this Court's precedents.  It goes no farther.*
> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme
> malfunctions in the state criminal justice systems," not a substitute for ordinary error
> correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct.
> 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition
> for obtaining habeas corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court was so lacking in
> justification that there was an error well understood and comprehended in existing
> law beyond any possibility for fairminded disagreement.[15]

---

[12] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[13] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[14] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[15] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[16]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[17]  This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[18]

## IV.  DISCUSSION

### Ground 1:  Excused Juror

The prosecution successfully challenged a juror for cause.  Xiong contends that in granting the prosecutor's challenge the trial court violated his due process rights and his right to a representative jury.  The California Court of Appeal disagreed, holding:

*Factual Background*
In the course of voir dire examination, juror No. 23 revealed that approximately five years before he had gone to school with a lot of gang members, both HNS and Masters of Destruction (MODs).  He had joined a gang when he was approximately 13 years old and was in the gang for a "[c]ouple years."  He would still see them sometimes.  He knew a lot about gangs, more than the average citizen. He felt he could be a fair juror, but really did not want to sit on the jury.

---

[16] *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[17] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[18] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

Juror No. 23 recognized putting aside his personal knowledge about gangs would be difficult.  Initially he thought he could put the knowledge aside and rely only on the evidence presented at trial.  Later he was unsure he could do so. He then stated he did not think he could disregard his knowledge regarding gangs rather than relying exclusively on the evidence presented in court.

He asked to be excused, explaining it would not feel right to him, because he did not want to "have to put nobody away."  He was also uncomfortable sitting on the case because it involved allegations of gang affiliation and he did not "like having to go against anybody like that."

The prosecution challenged juror No. 23 for cause, based on his knowledge of gangs and his stated inability to set that knowledge aside.  Defense counsel objected.  The court noted juror No. 23 appeared very nervous and fidgety while he was being examined, and that he had specified he did not want to serve on this jury because of the gang issue.

The court granted the motion for cause.  The court noted juror No. 23's "background, knowledge, preconceptions and [ ] clear discomfort about serving on this case."  The court found that discomfort was caused by the case being a gang-related case.

*Analysis*

A prospective juror may be excused for cause for either actual bias, or implied bias.  Actual bias is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C).)  Implied bias exists in a number of circumstances, including "the existence of a state of mind in the juror evincing enmity against, or bias towards, either party." (Code Civ. Proc., §§ 225, subd. (b)(1)(B); 229, subd. (f).)

In general, the qualification[s] of jurors challenged for cause are 'matters within the wide discretion of the trial court, seldom disturbed on appeal.'" (*People v. Kaurish* (1990) 52 Cal.3d 648, 675.)  "[W]here answers given on voir dire are equivocal or conflicting, the trial court's assessment of the person's state of mind is generally binding on appeal.  [Citation.]  The trial court is in the unique position of assessing demeanor, tone, and credibility firsthand-factors of 'critical importance in assessing the attitude and qualifications of potential jurors.' [Citation.]  Hence, the trial judge may be left with the 'definite impression' that the person cannot impartially apply the law even though, as is often true, he has not expressed his views with absolute clarity.  [Citation.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 21.)

Contrary to [Xiong's] argument, prospective juror No. 23's statements were conflicting and equivocal.  He repeatedly stated his discomfort with serving on this jury because of the gang issues.  He vacillated between stating he could be fair to both sides and at other times saying he would not be able to disregard his knowledge about gangs.  Specifically remarking on juror No. 23's body language, the court noted his apparent nervousness and discomfort with the case, and that he tended to answer affirmatively to whichever attorney was questioning him.  The court got the "sense"

8

that juror No. 23 was "uncomfortable serving because of the gang allegations and background." On this record, we cannot say the trial court abused its discretion in granting the prosecution's challenge for cause.[19]

In federal courts, as in California, a trial court's decision to excuse a juror for cause is reviewed for an abuse of discretion.[20] Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,[21] the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief. Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[22] Because Xiong fails to present a question of constitutional dimension, he is not entitled to relief under his first ground.

Ground 2:  Insufficiency of the Evidence

Xiong argues that there is insufficient evidence to sustain the personal use of a firearm causing death enhancment. The California Court of Appeal rejected Xiong's argument:

> [Xiong] next contends there is insufficient evidence to support the enhancement that he personally discharged a firearm causing death. We are not persuaded.
> In assessing a claim of insufficient evidence, we view all the evidence in the light most favorable to the judgment and presume in support thereof the existence of

---

[19] *Xiong*, 2010 WL 24156 at *3-4.

[20] *See Uttecht v. Brown*, 551 U.S. 1, 17-18 (2007); *United States v. Lindsey*, 634 F.3d 541, 553 (9th Cir. 2011).

[21] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

[22] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (citing § 2254(d)(1))).

every fact the jurors reasonably could deduce from the evidence; "we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Under this standard of review, "an appellate court may not substitute its judgment for that of the jury.  If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

Under section 12022.53, subdivision (d), the prosecution was required to establish that [Xiong] personally discharged the firearm which proximately caused Lee's death.  In other words, the prosecution had to prove that [Xiong] was the shooter.  [Xiong] contests the sufficiency of the evidence that he was the shooter. For reasons that follow, we disagree with [Xiong].

At the party, [Xiong] and Lee had an exchange of heated, angry words relating to whose chicken could kick the other's chicken's ass.  When [Xiong] learned Lee had come from the "south area," he talked about gangs and gang members, particularly about gang members from the south area killing gang members from the north area and gang members from the north killing south area gang members in retaliation.  He said he would kill to become a true gangster.  [Xiong] was a member of the HNS gang, a northern Sacramento area gang.  As a gang member, respect and turf are important to him.  It was a reasonable inference from this evidence that [Xiong] and Lee were engaged in trash talking about whose chicken was the superior beast, and [Xiong] felt disrespected by Lee's comments. It is also a reasonable inference from the conversation between [Xiong] and Lee that [Xiong] believed Lee and his friends were gang members from the south area who had come to this party in the north area, his turf, a further act of disrespect.  It was not unreasonable to infer this intrusion onto his "turf," combined with the insult to *his* chicken, would have left [Xiong] feeling disrespected by Lee and wanting to retaliate. Nor was it unreasonable to interpret [Xiong's] comments about retaliatory shootings and his willingness to kill as a threat to Lee and an expression of intention.

The shots which killed Lee were fired from the Cadillac.  [Xiong] was seen arriving at the party and departing the party in the Cadillac.  [Xiong's] jacket and driver's license were found in the car.  [Xiong] called the car his "ride" and was making payments on it.  On the night of the murder, [Xiong] was seen getting into the driver's seat of the car shortly before the shooting.  The Cadillac's driver had been following Moua's car for quite a while, making illegal driving maneuvers before pulling alongside Moua's car.  The driver's window was down as it approached Moua's car.  Although there is evidence [Xiong] had passengers in the Cadillac, there is no evidence which suggests anyone other than [Xiong] was driving the Cadillac.  Nor were any other windows down.

There was gunshot residue on the driver's side door, the steering wheel and the ceiling above the driver.  A gun fired out the driver's side window would leave residue on the driver's side window, ceiling and door.  Gunshot residue was also found on [Xiong's] clothes.  Thus, the evidence supported the inference that the

shooter was also the driver of the Cadillac. It is untenable that someone in the passenger seat fired a .45 pistol through the driver's window because the pistol would have been located immediately in front of the driver's face and the sound of the shot would have been deafening to the driver.

Moreover, [Xiong] knew the murder weapon was a .45 caliber gun. His conversation with his brother reveals he thought police had found the murder weapon in his home, and wished he had hidden the gun better. [Xiong's] knowledge of the murder weapon and belief police had found it in his home support the inference he was the shooter.

[Xiong] lied to police about his whereabouts the night in question. He denied driving the Cadillac or going to the party at all. He told officers he had not been driving the Cadillac on the night of the 17th. He claimed he went to the mall by himself, and returned home around 8:00 or 9:00 p.m. When he got home, the Cadillac was gone. [Xiong] talked on the telephone and watched television alone. He denied ever being at the chicken fighting party or that he had ever been to a cockfight.

[Xiong] also instructed his brother to lie to police. He told his brother to confirm his story about being home around 8:00 or 9:00 p.m. and to say he had not driven the Cadillac. He told his brother if the police knew he was driving the Cadillac that night, he "would not get out." These false statements to police, his efforts to have his brother corroborate his lies, and his certainty that his being placed in the Cadillac that night would result in a conviction, support an inference of consciousness of guilt in the killing of Lee.

From this evidence the jury could reasonably infer [Xiong], as the driver of the Cadillac, was the shooter. That is, that he personally discharged the firearm which killed Lee. There is substantial evidence supporting the jury's findings that [Xiong] personally discharged a firearm causing death.[23]

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[24] This Court must, therefore, determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the

---

[23] *Xiong*, 2010 WL 24156 at *4-6.

[24] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.[25]   Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[26]

Xiong misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.[27]   In this case, the California Court of Appeal determined that there was sufficient evidence to support the finding that Xiong personally used a firearm in committing the murder.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.[28]   Xiong bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous;[29] a burden Xiong has failed to carry.  The record does not compel the conclusion that no rational trier of fact could have found proof of guilt, especially considering the double deference owed under *Jackson* and AEDPA.  Xiong is not entitled to relief under his second ground.

---

[25] *Jackson*, 443 U.S. at 318-19.

[26] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74.

[27] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[28] *See Jackson*, 443 U.S. at 326.

[29] 28 U.S.C. § 2254(e)(1).

Ground 3:  Gang Expert Testimony

Xiong contends that Detective Bailey was not a properly qualified expert and the

admission of his testimony was an abuse of discretion.  Respondent contends that because Xiong

relied solely upon cases applying state-law in his petition for review in the California Supreme

Court and not federal constitutional principles, he has not properly exhausted this ground, and

review by this Court is procedurally barred.[30]  This Court need not address that issue because this

Court may deny a habeas claim on the merits, the failure to exhaust notwithstanding, when it is

clear that the petition does not raise a colorable federal claim.[31]  In rejecting Xiong's arguments,

the California Court of Appeal held:

> "A person is qualified to testify as an expert if he has special knowledge, skill,
> experience, training, or education sufficient to qualify him as an expert on the subject
> to which his testimony relates." (Evid.Code, § 720, subd. (a).) "'We are required to
> uphold the trial judge's ruling on the question of an expert's qualifications absent an
> abuse of discretion.  [Citation.]  Such abuse of discretion will be found only where
> "'the evidence shows that a witness *clearly lacks* qualification as an expert.'"
> [Citation.]' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1062-1063.)
>
> Detective Bailey had been a Sacramento police officer for five and one-half
> years. In that time, he had worked as a patrol officer in a heavily gang populated area,
> the street gang enforcement team in South Sacramento, and finally as a detective in
> the gang suppression unit of the Sacramento Police Department.
>
> Bailey attended over 156 hours of classes given by various law enforcement
> agencies relating to gangs from August 2006 to March 2008.  Asian gangs were
> included in these courses.  In addition, Bailey attended weekly meetings with other
> Sacramento Police Department gang detectives, and monthly gang intelligence
> meetings held by the district attorney's office.  He discussed various aspects of gang
> culture, mentality, attire, codes of conduct, terminology and tattoos with other gang
> detectives and experts.  These discussions included Asian gangs.  Bailey also

---

[30] 28 U.S.C. § 2254(b)(2); *see Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir.
2003) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971); *O'Sullivan v. Boerckel*, 526 U.S. 838,
845 (1999)).

[31] *Cassett v. Stewart,* 406 F.3d 614, 624 (9th Cir. 2005); *see Rhines v. Weber*, 544 U.S.
269, 277 (2005) ("plainly meritless").

discussed these topics with gang members, again including Asian gang members. In
his years on the force, he had arrested and interviewed gang members, suspects,
witnesses and victims and had investigated at least 50 Asian gang cases.

      Bailey was specifically assigned to concentrate on Asian gangs. He had
personally spoken with at least 100 Asian gang members. He was familiar with the
HNS gang from reading old police reports and speaking with Asian gang detectives,
family members, victims and gang members, and from working on cases involving
members of the HNS gang.

      On this record, it was not an abuse of discretion to find Bailey qualified as a
gang expert. (See *People v. McDaniels* (1980) 107 Cal.App.3d 898, 904 [detective
with six and one-half years of experience, information on various gangs gathered
from police reports, interviews with people in custody and conversations with people
on the street, as well as studying the social customs, methods of operation of gangs
in south central Los Angeles].)[32]

Xiong's argument fails on at least two points. First, Federal Rule of Evidence 702, like

its California counterpart, allows a person to offer an opinion as an expert based upon

"knowledge, skill, experience, training, or education." Federal courts, like their state

counterparts, frequently allow police officers to testify as "experts" based upon their experience

and/or training.[33] To the extent that the Supreme Court has ruled on the qualifications of expert

witnesses, it has done so under its supervisory powers over the lower federal courts interpreting

the federal rules of evidence and not as a matter of constitutional law.[34] Those Supreme Court

cases that have applied constitutional principles are limited to those cases in which the *exclusion*

---

[32] *Xiong*, 2010 WL 24156 at *6-7.

[33] *See e.g., United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (testimony on
composition and organization of New York crime families); *United States v. Evans*, 272 F.3d
1069, 1094 (8th Cir. 2001) (recruitment of prostitutes, relationship between prostitutes and
pimps); *United States v. Hankey*, 203 F.3d 1160, 1167-69 (9th Cir. 2000) (gang affiliations and
consequences of gang membership); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)
(IRS agent's testimony that activities were illegal); *United States v. Diaz*, 878 F.2d 608, 617 (2d
Cir. 1989) (operations of narcotic dealers); *see also Knapp v. White*, 296 F. Supp. 2d 766, 777
(E.D. Mich. 2003) (testimony that children often delay in reporting sexual abuse).

[34] *See, e.g., Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999); *Daubert v.
Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-97 (1993).

of evidence infringed upon a weighty interest of the accused.[35]  Second, like California, the

decision of a federal trial court on the admissibility of an expert opinion is reviewed for abuse of

discretion.[36]  While abuse of discretion is an appropriate standard on direct review, in a federal

habeas proceeding it is not.[37]   Because Xiong fails to present a question of constitutional

dimension, he is not entitled to relief under his third ground.

V.  CONCLUSION AND ORDER

Xiong is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[38]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[39]

The Clerk of the Court is to enter judgment accordingly.

Dated: August 20, 2012.

/s/ James K. Singleton, Jr.<br>JAMES K. SINGLETON, JR.<br>United States District Judge

---

[35] *See, e.g., Holmes v. South Carolina*, 547 U.S. 319, 319-20 (2006) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

[36] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

[37] *Lett*, 130 S. Ct. at 1862 (2010).

[38] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[39] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.